UNITED STATES, ex rel., Pat COST-
NER, Sharon Golgan, Carolyn Lance,
Debra Litchfield, Becky Summers,
Kenny Brown, Edward Campbell, Don
Daniel, Jeffrey Foot, David Herman-
son, Arkansas Peace Center, and Viet-
nam Veterans of America, Arkansas
State Council, Inc., Plaintiffs,

v.

URS CONSULTANTS, INC., Morrison
Knudsen Corporation, MRK Incinera-
tion, Inc., and Vertac Site Contrac-
tors, Defendants.

No. 4:95CV448 JMM.

United States District Court,
E.D. Arkansas,
Western Division.

Oct. 22, 2001.

AR, Mick G. Harrison, Kentucky Environmental Foundation, Berea, KY, for plaintiffs.

J. Thomas Ray, Magistrate Judge, U.S. District Court, Steven T. Shults, Shults, Shults Law Firm, LLP, Little Rock, AR, John C. Martin, Mary Beth Bosco, Vincente L. Martinez, Patton Boggs, LLP, Washington, DC, Norah Molnar, Patton Boggs LLP, McLean, VA, for URS Consultants Inc.

Charles R. Nestrud, Chisenhall, Nestrud & Julian, P.A., Michael T. Jackson, Alltel Corporate Services, Little Rock, AR, for Morrison Knudsen Corporation and Vertac Site Contractors.

A. Douglas Chavis, III, U.S. Attorney's Office, Little Rock, AR, James L. Turner, U.S. Environmental Protection Agency, Dallas, TX, Michael F. Hertz, U.S. Department of Justice, Civil Division, Leslie Bell, Office of the Inspector General, Washington, DC, for U.S.

## ORDER

MOODY, District Judge.

This is a *qui tam* action brought on behalf of the United States[1] by Plaintiffs/Relators ("Plaintiffs") pursuant to the False Claims Act, 31 U.S.C. § 3729 *et seq.* Following a grant of partial summary judgment, the Court heard evidence on two issues: (1) whether tampering with the PT–125 occurred on July 14, 1992 and mid-July, 1993 as testified to by Mr. Don Daniel in his deposition and (2) whether defendants had the requisite knowledge of the tampering required by the False Claim Act. After carefully reviewing the transcripts of the trial on these issues and the post trial briefs filed by the parties, the Court finds that the plaintiffs have failed to sustain their burden of proof on either

Gregory Ferguson, Attorney at Law, North Little Rock, AR, Gary L. Green, Law Offices of Gary Green, Little Rock,

---

1. The United States has declined to intervene.

issue and the complaint will be dismissed in its entirety.

On the issue of whether tampering with the PT–125 occurred on any of the pertinent dates, plaintiffs relied heavily on the testimony of Don Daniel. Daniel's claim that he tampered with the PT–125 to reduce the occurrence of waste feed cutoffs is not credible and lacks support from any other probative evidence presented at the trial.

Daniel's demeanor on the witness stand did not promote confidence in his testimony and he was easily led into numerous inconsistencies by counsel for both sides. On cross-examination, it was established conclusively that Daniel has given numerous conflicting versions of his tampering beginning with an affidavit and proceeding through two statements to a government investigator, his deposition, and then his trial testimony.

His lack of familiarity with the instruments in question and the effect of changing the calibration in the manner he described gives the Court no hesitancy in completely discrediting his testimony.

Furthermore, Daniel's different versions of the tampering were contradicted by all of the other witnesses and by the contemporaneous site records and historian data. Although Daniel testified that all of the control room operators and technicians knew what he was doing, no witness would confirm his claims of tampering. The site records, which reflect Daniel's activities on the dates in question, do not contain any entry that he performed any task on the PT–125. Finally, the historian data which records the performance of the incinerator shows no evidence that tampering of the instruments was occurring.

Defendants also presented credible evidence from operators and engineers that, if tampering had occurred as described by Daniel, the effects on the incinerator would have caused emissions that would have been readily observable and that no such events happened.

Daniel's assertion that he altered priority settings on the Turnbull Control System is likewise not credible. Daniel admitted he never changed the interlock settings for automatic waste feed cutoffs. Moreover, every knowledgeable witness testified that priority settings did not affect waste feed cutoffs or regulatory compliance, but rather only controlled the annunciation of the alarms.

Plaintiffs' case also fails on the second prong that defendants had the requisite knowledge of the alleged tampering. The False Claims Act defines "knowing" and "knowingly" as: (1) "having actual knowledge of the information", (2) acting "in deliberate ignorance of the truth or falsity of the information", or (3) acting "in reckless disregard of the truth or falsity of the information". 31 U.S.C. § 3729(b).

The Court finds that neither URS Consultants, Inc. ("URS") nor Vertac Site Contractors ("VSC") had actual knowledge of the alleged tampering. Plaintiffs conceded that URS had no actual knowledge, and, although Daniel testified that his immediate supervisors were aware of his action, the overwhelming evidence was to the contrary. The only supervisor called by the plaintiffs specifically denied any knowledge and all of the VSC personnel consistently and credibly denied any knowledge.

The Court further finds that neither defendant acted with "reckless disregard" of any alleged tampering. Gentry and Associates was hired as an oversight contractor to perform inspection services continuously on site. The Gentry inspector, John Gillette, testified that he "never saw any evidence of tampering" while he worked at the site. Defendants instituted numerous procedures to safeguard against improper operation of the incinerator which was persuasive evidence of their vigilance and re-

futes any contention of a reckless disregard of misconduct.

Plaintiffs argue that there were "clues" which should have placed defendants on notice that something was amiss and prompted further investigation. These "clues" were argued to be historian data readings and elevated dioxin levels. Because all of the witnesses consistently offered alternative reasons for erratic PT-125 readings, the Court finds that the historian data reading has no probative value to prove knowledge or reckless disregard. Likewise, the elevated readings of dioxin at the site are attributable to numerous causes other than kiln puffs and tampering, thus, this evidence was of minimal significance to the issues to be resolved.

In accordance with the foregoing discussion, the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. From 1948 through 1987, the Vertac Site was home to various chemical, herbicide, and pesticide production facilities. Following abandonment of the site in 1987, EPA initiated an emergency removal action under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") to dispose of the approximately 28,000 drums of waste remaining on site.

2. Initially, the State of Arkansas contracted for performance of the cleanup, although EPA chose the remedy of on-site incineration. In 1989, the Arkansas Department of Pollution Control and Ecology ("ADPC & E") negotiated a contract for the on-site incineration of the chemical waste with MRK Incineration, Inc., which later assigned the contract to Vertac Site Contractors. The State of Arkansas paid for this portion of the cleanup from a privately-funded trust fund that resulted from litigation against one of the parties responsible for the contamination.

3. During the summer of 1992, ADPC & E recognized that the trust fund was insufficient to complete incineration of the waste. Consequently, EPA assumed primary responsibility for the performance of the ongoing response action. EPA determined that the threat of release posed by the continuing deterioration of the on-site drums containing the waste warranted continuation of the on-site incineration as the safest, most expedient way in which to dispose of the waste.

4. EPA formally assumed responsibility for the incineration project on June 8, 1993, when URS and EPA executed a Work Assignment Form under their pre-existing umbrella contract for Superfund remediation-related work within EPA Region VIII (the "ARCS" Contract). These instruments assigned URS the general oversight authority over the incinerator activities at the site. EPA also authorized URS to enter into a sole source contract with VSC, which allowed VSC to continue its incineration operations at the site.

5. EPA participated at the Vertac Site from the inception of the cleanup. EPA had a Remedial Project Manager assigned to the site, as well as a team of engineers, a risk assessment specialist and other scientists. During the period of the State's contract, EPA regularly communicated with the State and had access to the documents concerning the State contract and the performance of the incinerator. EPA also reviewed State reports concerning the site and conducted regular discussions with State personnel about various aspects of the operation. EPA was present for both trial burns.

6. Shortly after the June 8, 1993 assumption of the incineration operations, EPA sent another of its experts, Catherine Massimino, a Senior RCRA/Superfund Technical Specialist for EPA Region 10, to conduct a review of the incinerator. Ms.

Massimino produced a written report on July 13, 1993, which addressed both general operational issues at the site and the allegations that site workers had made to EPA through their attorneys in May of 1993.

7. Also following June 8, 1993, URS and VSC provided EPA with multiple reports of the site operations, including: daily reports; weekly reports (which included daily reports, shift engineer reports, unusual incident reports, and photographs); monthly reports; special reports authorized by Work Assignment Forms as to individual aspects of the incineration operations; RCRA compliance audit reports; quality assurance reports; payment reports; fee award reports; and air monitoring reports. URS's shift engineers were present on-site 24 hours per day, and their contemporaneous shift reports were included in the reports to EPA.

8. During the performance of the Vertac on-site incineration, EPA was aware of the allegations made by plaintiffs in this lawsuit, including those relating to tampering with the computer monitoring equipment. EPA conducted numerous investigations of these allegations. Despite plaintiffs' allegations and its investigations, EPA continued with the contract and continued to make payment under the contract.

9. The PT–125 sensor was located at the back of the kiln and measured the draft in the kiln in inches of water column ("w.c."). It then transmitted an electrical current signal to the computer monitoring system in a range of 4 to 20 milliamps. The kiln operated at a negative pressure. When the signal sent by the PT–125 reached a pre-established set point, or "interlock," which indicated that the kiln was approaching positive pressure, the system would initiate an automatic waste feed cutoff.

10. If properly calibrated at zero draft, the electrical signal from the PT–125 should read 4 milliamps. Proper calibration of the PT–125 was as follows: 0″w.c.= 4 milliamps; .5″ w.c. = 8 milliamps; 1″w.c. = 12 milliamps; 1.5″ w.c. = 16 milliamps; and 2″ w.c.= 20 milliamps.

11. Mr. Daniel testified that he tampered with the PT–125 on July 14, 1992 and, during his last days on the site, July 18–20, 1993. Mr. Daniel stated that he miscalibrated the PT–125 in order to stop the occurrence of waste feed cutoffs caused by the PT–125 reaching its interlock point.

12. The amount by which Mr. Daniel testified he elevated the zero changed throughout the case. Prior to trial, Mr. Daniel described elevating the zero as setting the PT–125 so that 1″ water column read as zero pressure; setting the PT–125 so that 1½″ water column read as zero pressure; or setting the PT–125 so that .5″ water column read as zero pressure.

13. At trial, Mr. Daniel testified that he elevated the zero so that 0″ water column equated with a milliamp reading of 8 milliamps.

14. At different times during the proceedings, Mr. Daniel also provided different versions of the manner in which he claimed to have tampered with the PT–125. Prior to trial, Mr. Daniel described a more "formal" calibration process which involved resetting the PT–125 calibration on the device. During trial, he testified that he also used a less formal means of tampering in which he used a screwdriver to adjust the zero. When asked how often he used this less formal method of tampering, Mr. Daniel stated "Several. Many times."

15. Daniel testified at trial that when tampering with the PT–125 he adjusted the zero by 1/2 inch.

16. Mr. Daniel stated that his "best estimate" of the date of tampering in 1992 was July 14, 1992. To the best of his recollection, Mr. Daniel stated that on that date he elevated the zero by way of the less formal method of tampering, the screwdriver method, in order to avoid waste feed cutoffs.

17. Mr. Daniel also described historian graphs for July 14, 1992. ( The historian provided a contemporaneous computer record of kiln operating conditions). Mr. Daniel described one graph for July 14, 1992 as depicting data that resembled an adjustment on the PT–125. This data appeared at 23:15 on July 14, 1992.

18. Mr. Daniel worked from 6:45 to 15:40 on July 14, 1992.

19. Mr. Daniel was not working on July 14, 1992 at 23:15 hours.

20. Based on the Control Room Operators Logbook and eyewitness testimony, no Instrument and Electrical Technician worked on the PT–125 during Mr. Daniel's July 14, 1992 shift. Mr. Robert Thornton, the Control Room Operator on duty during Mr. Daniel's July 14, 1992 shift testified that he did not call Mr. Daniel or any other technician to make any adjustment to the PT–125 during that shift.

21. The Event Log, which recorded waste feed cutoffs from the computer, reflects that waste feed cutoffs for PT–125 were minimal during Mr. Daniel's shift on July 14, 1992. Thus, the asserted motivation for Mr. Daniel's tampering activities— a cessation of continuing automatic waste feed cutoffs caused by positive kiln draft— did not exist during Mr. Daniel's shift on July 14, 1992.

22. Had Mr. Daniel tampered with the PT–125 as he testified, one would expect automatic waste feed cutoffs to have ceased after his shift ended. They did not. Instead, problems with PT–125 waste feed cutoffs worsened after Mr. Daniels July 14, 1992 shift and were not resolved until other technicians investigated and fixed the problems with the PT–125's operations.

23. The evidence, consisting of credible eyewitness testimony and contemporaneous records, establishes that Mr. Daniel did not tamper with the PT–125 during his shift on July 14, 1992 in order to stop waste feed cutoffs caused by the PT–125.

24. The contemporaneously recorded computer records from the site do not contain any evidence of tampering with the PT–125 on July 14, 1992.

25. VSC's project manager, Robert Apa, described the historian data as it was recorded during Mr. Daniel's shift on July 14, 1992. Mr. Apa compared the historian data for the PT–125 sensor to the non-regulatory PT–225 sensor. He explained that due to the proximity of these two sensors, one would expect both sensors to respond to operating conditions in the incinerator in a similar fashion. If Mr. Daniel artificially manipulated the PT–125, that manipulation would also alter the relationship between the PT–125 and the PT–225. Mr. Apa demonstrated that, throughout July 14, 1992, a strong correlation remained between the two sensors, thereby negating the existence of tampering. The Court finds that Mr. Apa was a credible and knowledgeable witness.

26. The only upward spike in the PT–125 on July 14, 1992 that Plaintiffs cite, at 23:15 hours, occurred after Mr. Daniel's shift and was attributable to regular maintenance issues.

27. Mr. Daniel testified that he worked for three hours during the morning of July 18th or 19th and returned for the night shift. He claimed to have adjusted the PT–125 improperly using a screwdriver.

28. Mr. Daniel did not work on the PT–125 during the July 18–20, 1993 time period.

29. The contemporaneous site records demonstrate that no work was performed on the PT–125 during Mr. Daniel's shifts July 18–20, 1993.

30. To the extent that the operational site records reflect PT–125 cutoffs prior to Mr. Daniel's shifts on these dates, the records set forth the reasons for the cutoffs and do not provide any evidence of tampering with the device.

31. Mr. Apa described the historian data as recorded during Mr. Daniel's shifts on July 18–20, 1993. Mr. Apa compared the historian data for the PT–125 to that of the PT–225. Mr. Apa testified that there is no step increase in the PT–125 graph, and there is nothing in the historian data that suggests tampering during these shifts.

32. Mr. Winchester, who designed and installed the computer monitoring system also analyzed the historian data from the mid July 1993 time period. Mr. Winchester testified that there was no evidence of a miscalibration of PT–125.

33. In addition to the records for July 14, 1992 and July 18–20, 1993, Defendants examined the site records for all the dates in July 1992 and July 1993 on which Mr. Daniel worked. None contained evidence of tampering with the PT–125.

34. Had Mr. Daniel miscalibrated the PT–125 as he claimed, many other persons at the site would have witnessed the tampering or its effects. Plaintiffs were unable to present any eyewitness testimony to corroborate Mr. Daniel's allegations.

35. Mr. Daniel claimed that all of the other instrument and electrical technicians knew about and participated in the tampering. Mr. Daniel also described the miscalibration process in terms that would have required the Control Room Operators to participate in the miscalibration.

36. No other witness confirmed Mr. Daniel's version of events.

37. Munro ("Buck") Tucker was a Control Room Operator at the Vertac Site. Mr. Tucker testified that he did not instruct Mr. Daniel to elevate the zero nor does he have any personal knowledge of any tampering or miscalibration event.

38. Greg Price, an Instrument and Electrical Technician, testified that he never elevated the zero. He also stated that he has no personal knowledge of anyone at the site elevating the zero.

39. Art Bates, an Instrument and Electrical Technician, testified that he did not tamper with the incinerator or know of anyone else doing so.

40. Daniel Fuller, the Operations Manager at the site from August 1991 through June 3, 1993, testified that he did not recall instructing Don Daniel or any other Instrument and Electrical Technician to recalibrate the TCS or to improperly recalibrate the PT–125.

41. Brent Weddle, a former maintenance worker, testified that he understood he would have lost his job had he tampered with the PT–125.

42. Robert Thornton, the Control Room Operator on duty on July 14, 1992, denied involvement in or knowledge of any tampering or miscalibration activities at the site.

43. Joey Moses, an Instrument and Electrical Technician, specifically accused by Mr. Daniel of participating in the alleged tampering, denied Mr. Daniel's allegations. Mr. Moses testified that he did not participate in any tampering or miscalibration activities and he did not have any knowledge of anyone else at the site doing so.

44. URS Shift Engineers Robert Rooke and James Winchester, as well as VSC's Site Manager, Robert Apa, described the impact of a miscalibration of the sort describe by Mr. Daniel. They noted that if the incinerator operated at a draft level lower than the true zero, there would have been positive pressure, causing a kiln puff. Thus, even had Mr. Daniel miscalibrated the PT–125 and avoided waste feed cutoffs, his actions would have produced kiln puffs of significant frequency and duration. Plaintiffs did not produce evidence of this occurring.

45. Mr. Daniel testified that he changed the "priority settings" in the Computer Turnbull Control System ("TCS"). He stated that other workers at the site did so too. He stated that the priority settings determined how often the TSC would process that particular signal. According to Mr. Daniel, the priority settings were improperly lowered from at least July 1992 through July 1993, except for temporary resettings performed in connection with interlock checks. Mr. Daniel also said that when the priority settings were properly set, the incinerator would not operate.

46. Mr. Daniel testified that he never changed the interlock settings for automatic waste feed cutoffs and he did not change the scan time for the TCS.

47. The priority setting controlled the annunciation of the alarms that tell the Control Room Operator of potential problems. Robert Rooke stated that a change in priority would not have affected how often the computer system read the signal for any particular parameter but would only have affected the manner in which the alarm was announced, ie. ringing of a bell or change in the color of the light.

48. This was confirmed by Mr. Winchester.

49. Mr. Daniel also testified in connection with a series of historian data graphs which depicted relatively long periods of time when the PT–125 did not show any movement. These examples were offered to show instances when the priority setting for PT–125 was low due to tampering.

50. Other historian data graphs presented by Mr. Daniel contradict this testimony. Mr. Daniel testified that lowering the priority setting would cause the TCS to overlook the PT–125 sensor, and that this low priority condition lasted for at least one year. Yet, the graphs show that, during the same time period, the historian continued to run and to record repeated movement of readings for the PT–125.

51. All of the Instrument and Electrical Technicians denied that they changed the priority settings. Mr. Fuller, the Operations Manager who allegedly gave Mr. Daniel the instruction to reset the priority, denied doing so.

52. Mr. Daniel described other types of PT–125 tampering that Plaintiffs contend demonstrates that tampering occurred on a routine basis. These were: (1) elevating the zero shortly after PT–125 was officially recalibrated; (2) elevating the zero during a lengthy plant shutdown to avoid showing an improperly elevated draft when the I.D. fan was shut down; and (3) elevating the zero when the kiln was experiencing low kiln draft to avoid PT–125 waste feed cutoffs.

53. Mr. Daniel testified that prior to an official PT–125 calibration test, he and other technicians would reset the PT–125 calibration to the proper level in order the hide the miscalibration prior to the testing. After the testing, he and other technicians would be called in to re-elevate the zero because the incinerator could not operate when the PT–125 was properly calibrated.

54. This testimony was refuted by other technicians, control room operators, the

oversight inspector and by VSC and URS management.

55. Mr. Daniel contended that during a plant shutdown he and other technicians would recalibrate the PT–125 correctly. This practice was followed because PT–125 would incorrectly read an elevated draft during the shutdown, and this reading would reveal the elevated zero practice.

56. This testimony was refuted by other technicians, control room operators, the oversight inspectors and by VSC and URS management.

57. Mr. Daniel testified that he and other technicians would be called on to elevate the zero of PT–125 when the incinerator was experiencing shutdown problems due to low kiln draft. He would then turn the screw of PT–125 until the waste feed cutoffs stopped. No other witness confirmed Mr. Daniels's version of these events.

58. Mr. Apa and Mr. Winchester evaluated the contemporaneous operating records and both concluded that there was no evidence of tampering with the PT–125.

59. Plaintiffs' allegations that the incinerator was operated while the rod ports were open does not show a pattern and practice of tampering.

60. Plaintiffs failed to establish that operation of the incinerator with the rod ports open was a recurring event. In fact, the evidence demonstrated that when this did occur on one occasion, Mr. Apa told the Control Room Operators that such a practice would not be tolerated. In addition, EPA was aware of VSC's practice of opening the rod ports during operations to remove occlusions of salt, and had no objection to this practice.

61. Plaintiffs presented evidence that Mr. Apa directed Instrument and Electrical Technicians to change the cutoff point for the non-regulatory PT–339 sensor prior to the May 13, 1993 salt release. Mr. Apa testified that a non-regulatory cutoff was in place which was engaging due to a salt buildup. After consulting the equipment limitations, the cutoff was raised. Nevertheless, an excessive pressure build-up developed which ultimately damaged the spray dryer and forced a shutdown of the incinerator. Plaintiffs also showed that Mr. Fuller ordered the I.D. fan turned on to cool down the unit. In order to do that, the Instrument and Electrical Technicians had to install "branches" in the PLC Logic, which was normal procedure for a startup. As a result of the decision to activate the I.D. fan, salt was released from the stack on May 13, 1993.

62. EPA investigated this incident. EPA confirmed that the change in the PT–339 cutoff was a non-regulatory event and was consistent with the manufacturers specifications. EPA described the decision to start up the I.D. fan as bad judgment, and approved the operating procedure revisions that VSC implemented to avoid a similar incident. EPA did not find that the event violated applicable contract provisions. EPA did not cite VSC for a regulatory violation. EPA evaluated the impacts of the salt release and concluded that the contaminants released on May 13, 1993 did not present an unacceptable risk to human health or the environment. The May 13, 1993 salt release does not establish a pattern and practice of tampering.

63. URS did not have actual knowledge of the alleged tampering with the PT–125 or the priority settings. Mr. Daniel testified that URS did not have knowledge of the tampering he alleges, and that, in his view, URS did nothing improper at the site.

64. VSC did not have actual knowledge that the alleged tampering had occurred. Mr. Daniel testified that Bob Apa did not have knowledge of the tampering, and in fact would have never condoned it. Mr.

Daniel alleged that his immediate supervisors were aware of his actions, but the only supervisor called by Plaintiffs, Dan Fuller, denied any knowledge.

65. The VSC Project Manager Bob Apa, the VSC Operations Manager Dan Fuller, the Gentry Inspector John Gillette, the URS Site Project Manager Jack Danielson and the URS shift engineers Bob Rooke and James Winchester never heard any allegations or encountered any credible evidence of tampering with either the PT–125 or the TCS system in order to circumvent the regulatory interlocks during operation of the incinerator. Defendants' other witnesses URS Site Engineer Fritz Heneman, Robert Thornton and Joey Moses, confirmed that they were not aware of any evidence of tampering.

66. The record establishes that Defendants did not have actual knowledge of tampering with the PT–125 or any other incinerator devices in order to circumvent applicable regulatory requirements.

67. Plaintiffs did not establish that Defendants acted with reckless disregard.

68. Defendants did not act with reckless disregard with regard to evidence of tampering that should have been apparent from the historian data. Plaintiffs' witnesses described normal operational conditions that would produce the alleged erratic readings of the PT–125.

69. Witnesses identified normal operational causes which would explain instances when the PT–125 would exhibit a draft reading when the system was shut down.

70. Mr. Winchester testified that a positive reading of the PT–125 during a divert situation with the I.D. fan turned off was a natural phenomenon that did not indicate that the instrument sensor was out of calibration.

71. Plaintiffs also assert that differences between the historian data and the westronics "strip chart" should have

caused the Defendants to conclude that tampering had occurred. However, testimony explained the reasons for the discrepancies other than tampering.

72. Plaintiffs did not establish that VSC hid its on-site air emissions data because it constituted evidence of tampering.

73. Defendants did not recklessly disregard elevated readings of dioxin levels at the site. The Vertac Site housed various chemical, herbicide, and pesticide production facilities from 1948 through 1987. Air-borne dioxin at the site reasonably could result from wind-blown soil, volatilization of the feedstock into the incinerator, or from salt or ash produced as part of the incineration process. The experts who studied the site for EPA in 1992 did not themselves automatically attribute high dioxin readings to kiln puffs alone. Accordingly, the existence of air-borne dioxin at the site should not have automatically led Defendants to the conclusion that someone had tampered with the PT–125.

74. At the February 1992 meeting convened by EPA to study the cause of elevated dioxin levels at the site, VSC Project Manager, Bob Apa advised EPA, ADPC & E and the independent consultants that VSC believed four of the five elevated dioxin samples being studied by EPA could be correlated to reported kiln puffs or flame-outs occurring on specific dates.

75. Unlike the URS perimeter air monitors, there was no requirement that VSC report the results of its on-site monitors.

76. As of June 1993, EPA was aware of the VSC on-site monitoring data. On April 21, 1994, William Luthans, Chief of EPA's Arkansas/Louisiana Enforcement Section wrote to the local newspaper explaining the differences between the VSC monitoring data and the EPA ambient air action levels. Mr. Luthans explained that because the VSC monitors are located ad-

jacent to the incinerator, they cannot be compared to the EPA ambient air monitoring action levels which are levels established to protect the community beyond the fenceline who may be exposed twenty-four hours a day, seven days a week.

77. Further, even during the time period when the State of Arkansas had lead responsibility for the incineration, EPA used VSC's operations logs and other site reports to understand and interpret the URS perimeter air monitoring data.

78. The evidence does not show a deliberate effort on the part of VSC to hide its on-site air monitoring data, or other data.

79. In order to ensure continuous and consistent inspection services during its transition as EPA oversight contractor, URS subcontracted with the State's oversight contractor, Gentry & Associates to continue performing inspection services at the site for a transitional period after June 1993. While under contract with URS, the Gentry inspectors were required to provide 24-hour per day inspection services. The Gentry inspectors filled out daily logs, unusual incident reports and photographed conditions at the site. EPA received copies of all of Gentry's documentation.

80. John Gillette, a Gentry Inspector, testified that he never saw any evidence of tampering.

81. URS Shift Engineer, James Winchester, testified that he regularly checked the reading of the magnehelic gauge against the PT–125 reading in the Control Room. He watched the screen readings in the Control Room. He compared the historian data to the strip chart. He looked for signs of tampering but found none.

82. Mr. Winchester also participated in URS's investigation and reports to EPA as to the causes of kiln puffs, waste feed cutoffs and diverts. Throughout all of this study, Mr. Winchester did not identify an incident in which a kiln puff, divert, or similar occurrence went unreported, or in which tampering was implicated.

83. URS Shift Engineer, Robert Rooke, also cross checked the magnehelic gauge with the PT–125, compared historian data to the strip chart readings and investigated rumors. He found no evidence of miscalibration of the PT–125.

84. Bob Apa also testified that he looked out for signs of tampering at the site, walked the site, and made inspections. He never received any information that anyone tampered with the PT–125.

85. VSC also employed an on-site compliance officer who monitored the performance of the incinerator for compliance, including regular interlock checks.

86. EPA representative, Richard Ehrhart testified in his deposition which was received in evidence that URS maintained a number of different logs and reports which would enable one to corroborate whether a specific event occurred. In addition, he testified that he had no reason to believe that URS or VSC knowingly and intentionally submitted false statements to the EPA. Mr. Ehrhart testified that he did not feel misled by URS or by VSC with regard to fugitive emissions, medical monitoring data, blood test data or other exposure data.

87. Mr. William Luthans of the EPA stated by way of deposition admitted at trial that he did not receive any information that URS or VSC withheld or falsified information.

88. Plaintiffs failed to prove their underlying theory that design defects made the alleged tampering a necessity in order to operate the incinerator. In February, 1992, the EPA assembled a group of incineration experts to evaluate the Vertac incinerator. The report summarizing the evaluation revealed that the Vertac incin-

erator system as a whole was well designed and properly operated. In addition, in March 1992, the EPA stated that the Vertac incinerator employed state of the art equipment and was fully in compliance with regulations governing hazardous waste incinerators.

89. Plaintiffs also failed to tie their allegations of design defects to the claimed tampering. Mr. Rooke testified that the problems noted with the incinerator would not have been remedied by the alleged tampering with the PT–125.

90. There was no tampering with the PT–125 on the Vertac incinerator in order to circumvent regulatory or contractual requirements.

91. Employees of defendants did not tamper with the PT–125 sensor in order to bypass the regulatory interlocks required of the incinerator on July 14, 1992.

92. Employees of defendants did not tamper with the PT–125 sensor in order to bypass the regulatory interlocks required of the incinerator during mid-July of 1993.

93. Defendants did not have knowledge, actual or otherwise, of the tampering with the PT–125 sensor that is alleged by plaintiffs in this case.

94. Defendants did not knowingly, as that term is defined in the FCA, submit false claims for payment or false statements to EPA in order to obtain payment of the contract amounts or to avoid other obligations to the government.

## CONCLUSIONS OF LAW

 1. An FCA relator must prove by a preponderance of the evidence that the defendant knowingly submitted a false claim or statement to the federal government for the purpose of obtaining payment from the government or for decreasing an obligation owed to the federal government. The term "knowingly" encompasses actual knowledge, reckless disregard of the truth, or intentional ignorance of the truth.

 2. None of the defendants knowingly submitted a false claim or statement to the government related to the two instances of tampering to the PT–125 described by relator Don Daniel.

3. None of the defendants knowingly submitted a false claim or statement to the government with respect to their performance of remediation work at the Vertac Site.

4. Plaintiffs are not entitled to any adverse inferences and have not presented any evidence from which knowledge of falsity or intent to submit a false claim may be inferred.

## CONCLUSION

It is therefore ordered that Plaintiffs' complaint be dismissed as to Defendants' URS Consultants Inc., Morrison Knudsen Corporation and Vertac Site Contractors. The Court will address Plaintiffs' motion for default judgment (docket #307) against Separate Defendant, MRK Incineration, Inc., by separate order.